FILED 09 JUL 24 15:47 USDC-ORP

FILED
JUL 24 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CATHERINE HICKMAN, | ) | |
| Plaintiff, | ) ) ) | CV 08-517-KI |
| v. | ) ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) | OPINION AND ORDER |
| Defendant. | ) ) | |

KING, J.,

      Plaintiff Catherine Hickman challenges the Commissioner's decision denying her application for supplemental security income payments under Title XVI of the Social Security Act. I have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). I AFFIRM the Commissioner's decision.

      The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative

1 - OPINION AND ORDER

law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ found Hickman was impaired by degenerative disc disease in the lumbar and cervical spine, a personality disorder, and a history of alcohol and drug abuse in sustained remission. Admin. R. 397. She assessed Hickman with the residual functional capacity ("RFC") to perform the exertional requirements of light work with limited crawling and climbing. The ALJ found Hickman restricted to simple, routine, repetitive work involving a low level of work pressure and limited social interaction. *Id.* at 399. The ALJ found these limitations precluded Hickman from performing any of her past relevant work, but left her able to perform other work in the national economy. *Id.* at 405

Hickman argues the ALJ failed to identify all of her severe impairments, improperly assessed her residual functional capacity ("RFC"), relied on testimony from the vocational expert ("VE") which was not consistent with the Dictionary of Occupational Titles ("DOT"), and elicited testimony from the VE with hypothetical assumptions that did not accurately reflect her functional limitations.

The parties stipulate that Hickman filed her application on June 5, 2000, alleging disability beginning in November 1997. Payments under Title XVI cannot be paid for months prior to the month in which the claimant filed her application. 20 C.F.R. §§ 416.203, 416.501. Accordingly, to prevail on her claim, Hickman must prove she was disabled within the meaning of the Social Security Act after June 5, 2000.

## I.   Severe Impairments

Hickman contends the ALJ erred at step two by failing to identify a learning disorder when specifying her severe impairments. At step two, the ALJ must determine whether the claimant has any combination of impairments which significantly limits her ability to do basic work activities.

20 C.F.R. § 416.920(c). If the claimant does not have any such impairment or combination of impairments, the ALJ must find her not disabled and need not continue the disability determination process beyond step two. 20 C.F.R. § 416.920(a)(4)(ii).

In the present case, the ALJ resolved step two in Hickman's favor, finding she had impairments severe enough limit her ability to work. Admin. R. 397. The ALJ properly continued the decision-making process until reaching a determination at step five. Any error in designating specific impairments severe did not prejudice Hickman at step two of the decision-making process. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005)(Any error in omitting an impairment from the severe impairments identified at step two was harmless where step two was resolved in claimant's favor); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)(failure to list an impairment as severe at step two was harmless error where the ALJ considered the functional limitations posed by that impairment later in the decision).

Hickman's argument may be construed as a challenge to the ALJ's RFC assessment. Once a claimant has surmounted step two by showing severe impairment, the ALJ must consider the functional limitations imposed by all medically determinable impairments, including any that were not identified as severe at step two, in the remaining steps of the decision. 20 C.F.R. § 416.923. Accordingly, the ALJ was required to evaluate all the evidence of functional limitations from a learning disorder in assessing Hickman's RFC.

On May 18, 2005, Jeff Guardalbene, Psy.D., performed a learning disorder evaluation of Hickman, including a clinical interview and administration of intelligence and achievement tests. Dr. Guardalbene found Hickman met the diagnostic criteria for a reading disorder. Admin. R. 818. Her math skills were sufficient for simple everyday math. She was capable of jobs requiring very

basic writing skills, but could not be expected to write detailed reports of more than a few sentences. *Id.* at 817. Speed and accuracy in processing information was a strength, and Dr. Guardalbene opined that Hickman would be a good candidate for a light assembly job. *Id.* at 819. Dr. Guardalbene suggested Hickman would perform best if she received verbal instructions and hands-on demonstration of work instead of written instructions. *Id.* at 820.

The ALJ discussed Dr. Guardalbene's report and gave his opinion significant weight. *Id.* at 404. She interpreted Dr. Guardalbene's opinion as indicating Hickman is capable of simple work. *Id.* In her RFC assessment, the ALJ found Hickman restricted to simple, routine, repetitive work. *Id.* at 399. The ALJ elicited testimony from the VE with the vocational assumption of an individual capable of "simple tasks involving . . . minimal reading or writing." *Id.* at 965. The VE testified that such a person could perform the job of office helper, which required the ability to alphabetize but did not require much reading or writing. *Id.* at 966.

Hickman argues the ALJ should have included additional limitations indicating she would need extra time and assistance to understand written materials and her writing would be full of spelling and punctuation errors. The ALJ's exclusion of work requiring more than minimal reading or writing reasonably accounts for the limitations Hickman urges. The ALJ could reasonably infer from Dr. Guardalbene's opinion that Hickman retained the ability to perform work that minimized the need to write or understand written materials. The ALJ could reasonably infer from the VE's testimony that the job of office helper did not require reading or writing abilities exceeding those Hickman possessed.

In summary, any error in failing to designate reading disorder a severe impairment at step two was harmless because the ALJ resolved step two in Hickman's favor and considered all the evidence

of functional limitations attributable to a reading disorder at the later steps in the decision-making process. If construed as a challenge to the ALJ's RFC assessment, Hickman's argument fails because she did not produce evidence of functional limitations in excess of those used by the ALJ to elicit testimony from the VE.

## II.    RFC Asessment

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. § 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5. Hickman contends the ALJ failed to properly consider the medical source statements of Margot Bolstad, D.O., Robert Irwin, M.D., and Pamela Miller, Ph.D. Hickman argues the ALJ also improperly rejected the statements of five lay witnesses.

### A.    Medical Source Statements

Margot Bolstad, D.O., provided Hickman's primary care from 1998 to June 2000. Hickman then transferred care to a different primary care physician at about the time she filed her application and the relevant period for her claim began. In November 1998, Hickman had been arrested after abusing alcohol and methamphetamine and was to be sent to a treatment center by her Probation Officer. Hickman requested a note from Dr. Bolstad to restrict her activities while at the treatment center based on subjective complaints of neck and right shoulder pain. Dr. Bolstad recommended restrictions of no overhead lifting with the right arm, no pushing or pulling, and no lifting over 15 pounds. Admin. R. 304.

During the time Dr. Bolstad treated her, Hickman complained of chronic neck pain dating to a fall in the remote past and right shoulder pain from being struck with a nightstick in the remote past. *Id.* at 299-300. X-rays from 1997 showed degenerative changes in the cervical spine. Dr. Bolstad thought radiculopathy might account for Hickman's symptoms. *Id.* at 298. In October 1999, Hickman complained of increased neck pain, but Dr. Bolstad obtained normal findings on her neurological examination. Hickman was then evaluated by Emily Moser, M.D., a specialist in neurology. *Id.* at 294-95. Dr. Moser found no objective signs of radiculopathy on physical examination or with electrodiagnostic studies. Hickman exhibited breakaway weakness in the right arm, but Dr. Moser suspected she had full strength. *Id.* at 353-55.

In April 2000, Dr. Bolstad thought Hickman had decreased muscle strength in all muscle groups of the right arm. New x-rays of the cervical spine showed further degenerative changes compared to the images from 1997. Dr. Bolstad requested authorization for an MRI to rule out nerve impingement from a herniated disk or disk bulge. *Id.* at 293. Hickman's care was transferred to another physician, however, before an MRI of the cervical spine was obtained.

Hickman argues the ALJ improperly rejected a statement in Dr. Bolstad's treatment notes from May 18, 1999. Dr. Bolstad noted: "She is currently not able to work due to her right arm pain and weakness." *Id.* at 296. In context, the quoted statement appears to be a record of Hickman's subjective report to Dr. Moser instead of a medical opinion. The ALJ found Hickman's subjective reports unreliable, and Hickman does not challenge the ALJ's credibility determination. To the extent the statement reflected Dr. Bolstad's medical opinion, the ALJ found it vague and unpersuasive if it purported to show incapacity for the 12-months required to establish disability under the Social Security Act.

6 - OPINION AND ORDER

Ordinarily, a treating physician's opinion is entitled to significant weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record. 20 C.F.R. § 416.927(d)(2). The question whether a claimant is employable is not a medical opinion about specific functional limitations, but an administrative finding which is reserved by the regulations to the Commissioner. Opinions on issues reserved to the Commissioner cannot be ignored, but are not entitled to special significance, even when offered by a treating physician. 20 C.F.R. § 416.927(e); SSR 96-5p, 1996 WL 374183, *2-3. Accordingly, the statement in Dr. Bolstad's notes that Hickman could not work is not entitled to special significance, even if it reflected Dr. Bolstad's opinion.

An ALJ can reject a treating physician's opinion in favor of the conflicting opinion of another treating or examining physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ may reject it only for clear and convincing reasons. *Id.* Dr. Bolstad's opinion that radiculopathy might be the source of Hickman's pain was contradicted by the contemporaneous opinion of Dr. Moser who found no evidence of radiculopathy and obtained only normal objective findings on examination and electrodiagnostic studies.

The ALJ's conclusion that Dr. Bolstad's opinion was vague is supported by the record. Dr. Bolstad did not identify specific functional limitations or work-related activities that Hickman could not do. Accordingly, Dr. Bolstad provided no basis other than Hickman's discredited subjective claims, for the opinion that Hickman could not work.

7 - OPINION AND ORDER

In addition, the ALJ noted that Dr. Bolstad did not purport to indicate Hickman was permanently disabled. Her notes only described Hickman's then-current condition. The ALJ could reasonably conclude that even if Hickman was not able to work in May 1999, this did not establish such incapacity for a continuous period of 12 months or relate to the period after she filed her application.

In summary, Dr. Bolstad's notes from May 19, 1998, do not appear to be a medical opinion. To the extent they represent Dr. Bolstad's medical opinion, they are not supported by specific findings and are inconsistent with the contemporaneous findings of Dr. Moser. Even if fully credited, they would not show incapacity of sufficient duration to establish disability and they do not relate to the time that is relevant for Hickman's claim. Accordingly, there was no error in the ALJ's evaluation of Dr. Bolstad's treatment records.

Robert Irwin, M.D., performed a consultative evaluation in July 2001. Admin. R. 305-310. He reviewed limited medical records, took Hickman's subjective history, and performed a physical examination. Hickman described her worst problem as neck pain resulting from a fall in November 1997. She had right shoulder pain resulting from being struck in May 1998. The pain was located in the acromioclavicular joint and associated with lifting weight and moving her arm in abduction and extension. Hickman also complained of tailbone pain associated with sitting for prolonged periods and low back pain associated with bending over. Hickman reported she did no housework except laundry and dishes. She spent her time watching television. *Id.* at 305-06.

On physical examination, Dr. Irwin obtained generally normal findings, except Hickman had a positive straight leg raise test and limited range of motion in virtually all joints. Hickman was tender to palpation at the cervical spine, the sacroiliac joints, and the acromioclavicular joints. She

had positive Waddell's signs for non-organic pain with rotation and gentle compression of the spine. Hickman demonstrated full to near full strength in all major muscle groups. Her sensory examination was normal except for some decreased sensation to light touch from the elbow to the fourth and fifth digits of the right hand on the ulnar side of the right arm. *Id.* at 307-09.

Dr. Irwin was unable to give a definitive diagnosis to explain Hickman's symptoms without further time and testing. He noted that her marked decrease in range of motion, apparent sensory loss, and an x-ray report demonstrating disc disease at C5-6 raised the possibility of radiculopathy in the cervical spine. He also noted Dr. Moser's normal nerve conduction studies and clinical findings, which suggested the absence of radiculopathy. Dr. Irwin did not diagnose the cause of Hickman's shoulder pain or lower back pain, but noted the conflicting evidence regarding a potential radiculopathy. *Id.* at 309-10.

Hickman argues the ALJ improperly rejected Dr. Irwin's assessment of significant spinal impairments. The ALJ considered Dr. Irwin's report in context with the record as a whole and accepted that Hickman has degenerative disc disease in the cervical and lumbar spine limiting her to light lifting, occasional crawling or climbing, and no more than 6 hours of sitting, standing, or walking during a work day. *Id.* at 397, 399, 402. Thus the ALJ did not reject Dr. Irwin's assessment of significant spinal impairments. The ALJ rejected only Hickman's interpretation that Dr. Irwin's assessment established limitations in excess of this RFC assessment.

An ALJ can reject an examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ provides specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas*, 278 F.3d at 957; *Magallanes*, 881 F.2d at 751; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Here, the ALJ noted the stark

9 - OPINION AND ORDER

difference between Dr. Irwin's report and the findings of Robert Tilley, M.D., who examined Hickman in March 2006. Admin. R. 402. Whereas Dr. Irwin found marked decreases in all ranges of motion, Dr. Tilley found Hickman had full ranges of motion, with complaints of pain which he found nonspecific, unlocalized and unconvincing. Hickman had full strength in all muscle groups and no significant atrophy in muscle bulk or tone. Her straight leg raise tests for radiculopathy were negative. *Id.* at 445-48. Dr. Tilley performed a formal review of Hickman's medical records and found "no pathological findings that would indicate that this patient has anything other than mild degenerative disease." *Id.* at 448. Dr. Tilley thought Hickman's symptoms could be managed with over-the-counter medications.

  The ALJ noted that Dr. Irwin's diagnostic impression was vague. While he found neck pain, shoulder pain, and lower back pain, he was unable to diagnose any pathology or etiology. He did identify specific range of motion limitations, but these were based on Hickman's subjective presentation of pain which the ALJ reasonably doubted based on Dr. Tilley's findings and her own adverse credibility determination which Hickman does not challenge. Dr. Irwin did not identify specific work-related activities Hickman would be unable to perform.

  Hickman challenges the ALJ's statement that Dr. Irwin lacked adequate medical records and relied to a significant extent on Hickman's subjective presentation. Dr. Irwin reviewed Dr. Bolstad's treatment notes from one office visit, Dr. Moser's report, and an x-ray report from April 2000. *Id.* at 305. Dr. Irwin himself noted that he lacked imaging studies necessary to make a definitive diagnosis and that further time and testing would be needed. *Id.* at 309-10. Dr. Tilley, on the other hand, performed an extensive review of Hickman's medical records covering many years. *Id.* at 444. The ALJ could reasonably conclude that Dr. Tilley's assessment was based on more extensive and

accurate information about Hickman's medical history than Dr. Irwin possessed. The ALJ could reasonably infer that Dr. Irwin relied on Hickman's subjective reports and presentation to supplement the meager medical record available to him. Accordingly, the ALJ's determination that Dr. Tilley provided a more accurate assessment of Hickman's physical limitations than Dr. Irwin is supported by specific and legitimate reasons based on substantial evidence in the record.

Pamela Miller, Ph.D., performed a consultative psycho-diagnostic examination of Hickman in August 2001. Admin. R. 311-16. This was comprised of a clinical interview, mental status examination, and a review of progress notes from 3 primary care office visits. *Id.* at 311. Hickman complained of anxiety and angry outbursts. She reported difficulty socializing, being around many people, trusting others, coping with stressors, motivating herself, and accomplishing tasks. *Id.* at 314. In her mental status examination, Dr. Miller found Hickman's interpersonal skills adequate, persistence and motivation good, and concentration and attention normal. She could count and spell forward and backward and solve simple math calculations in her head. She could follow a simple 3-step command without hesitation or problem. Her thought processes were logical and coherent, insight and judgment were adequate, and concrete reasoning was normal. Abstract reasoning was limited. *Id.* at 314-15. Dr. Miller opined that, due to back and shoulder pain and anxiety symptoms, Hickman "does not seem to be a good candidate for full time employment." *Id.* at 315. Hickman argues the ALJ improperly rejected Dr. Miller's opinion.

In fact, none of Dr. Miller's specific findings are inconsistent with the ALJ's RFC assessment. Dr. Miller found Hickman's interpersonal skills, persistence, motivation, concentration, attention, and intellectual capacity adequate for simple tasks. The agency psychological consultants reviewed Hickman's case record and reached conclusions consistent with Dr. Miller's specific

findings. The psychological consultants opined that those findings left Hickman capable of simple, routine, repetitive work requiring limited contact with the general public. *Id.* at 249-52, 286-88. In her RFC assessment, the ALJ limited Hickman to work requiring simple, repetitive, routine tasks with limited social interaction. The only aspect of Dr. Miller's opinion discounted by the ALJ was the general conclusion that Hickman did not seem to be a good candidate for full time employment.

As noted previously, the question whether a claimant is employable is not a medical opinion about specific functional limitations, but an administrative finding which is reserved by the regulations to the Commissioner. 20 C.F.R. § 416.927(e); SSR 96-5p, 1996 WL 374183, *2-3. That administrative finding involves both a medical and a vocational component. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000). Here, the ALJ accepted the medical component of Dr. Miller's disability opinion and reasonably relied on the agency reviewing psychologists and the VE's testimony for the vocational component. Accordingly, the ALJ did not err in evaluating Dr. Miller's opinion.

In summary, the ALJ properly considered the medical source statements and gave sufficient explanation for the weight she gave them in her decision. Even if their findings and opinions could reasonably be interpreted as Hickman urges, the court may not substitute that interpretation in place of the Commissioner's findings. Where "the evidence is susceptible to more than one rational interpretation," the Commissioner's interpretation must be affirmed. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

  **B.**  <u>**Lay Witness Statements**</u>

Several lay witnesses provided written statements in support of Hickman's claim. Edna Siler, the mother of Hickman's boyfriend Rocky Jones, completed a third-party questionnaire in June 2000.

Siler indicated Hickman did laundry, washed a few dishes at a time, and helped prepare meals, but did not perform other household chores or participate in activities or hobbies. She had no problems with people and was able to leave the house to shop, visit others, go out to diner, and socialize. She read the newspaper. She could drive a car but it hurt her shoulder. Siler indicated Hickman slept a lot during the day, watched a lot of television, and did not do much of anything else. Admin. R. 150-58

Rocky Jones, Hickman's live-in boyfriend at the time, completed a third-party questionnaire on activities and socialization in July 2001. Jones indicated Hickman got along very well with family members and friends and had no problems with others such as store clerks. Hickman was able to leave home to shop, visit others, and participate in social activities. She watched television, read the newspaper and magazines, and did crossword puzzles. Hickman engaged in light stretching exercises, accompanied others while they fished, went camping, drove a car, and did laundry, cooking, and light gardening. Jones indicated Hickman had trouble sleeping but usually got up and dressed upon arising in the morning. Some days Hickman would nap for 10 minutes to an hour when she had pain or over-exerted herself. *Id.* at 183-94.

In August 2003, Hickman was living with a different boyfriend, Neal Lefler. Lefler indicated Hickman cooked, took care of the house, bowled, fished, and swam a lot at some point in their relationship. By August 2003, however, she no longer did these things, complaining that she had no arm strength and could not rotate her neck or bend over. Lefler indicated Hickman had no difficulty getting along with others. *Id.* at 582-90

13 - OPINION AND ORDER

In February 2007, Shirley Casteel wrote a note indicating that Hickman had helped her with her house work and child care after Casteel had undergone surgery in January 2007. Hickman complained of swelling in the neck and pain in the back with these activities. *Id.* at 439.

In March 2007, Harlan Punch wrote a note indicating Hickman had been living with him for seven months and had experienced ups and downs with her health. Hickman had complained about her neck and butt, lifting, sleepiness, problems reading, and difficulty remembering things. She was quick to react against little things. She had tried to work but had to quit due to her limitations. *Id.* at 442.

Hickman contends the ALJ improperly rejected these lay witness statements. An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

The ALJ considered all of these statements in detail. Admin. R. 401-02. She found the lay witnesses sincerely described their observations of Hickman's behavior, but noted inconsistencies among the various statements regarding her activities, sleep habits, reading ability and other matters. The ALJ could reasonably infer that the lay witness statements, taken together and in context with the record as a whole, failed to show that Hickman did not have the ability to perform activities within the limitations of her RFC assessment. Accordingly, the ALJ did not discredit the lay witnesses. She simply found they did not support a finding of disability or establish limitations exceeding those in Hickman's RFC assessment.

Hickman argues the lay witness statements do not show she can sustain work-related activities for a full-time work schedule, even if they do support the ability to engage in extensive activities sporadically. While this may be a reasonable interpretation of the lay witness statements, it is insufficient for Hickman's argument to prevail. The question for this court is whether the ALJ considered the statements and drew rational inferences from the record as a whole. The ALJ did not disregard the lay witness statements without comment; she considered the statements in context with the record as a whole. While the conclusions she reached differ from those Hickman urges, they are not irrational and must be affirmed. *Andrews*, 53 F.3d at 1039.

### III. <u>Vocational Evidence</u>

At step five of the sequential decision-making process, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do despite the limitations in her RFC assessment. *Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999). The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the claimant's limitations and restrictions. 20 C.F.R. § 416.966; *Tackett*, 180 F.3d at 1098-99; *Andrews*, 53 F.3d at 1043.

Here, the ALJ elicited testimony from the VE based on a series of hypothetical questions. Admin. R. 963-66. The VE testified that a hypothetical person with the limitations in Hickman's RFC assessment could perform the work activities required in the occupation of office helper, which represented thousands of jobs in the national and local economy. *Id.* at 965. Hickman challenges this vocational evidence on four grounds.

First, Hickman argues the occupation of office helper requires abilities exceeding her RFC assessment. The RFC assessment restricted her to simple, routine, repetitive work. Hickman relies

on the DOT job description, which includes general education development ("GED") levels for reasoning, math, and language. The DOT assigns a GED reasoning level of two for the occupation of office helper. GED reasoning level two means the worker must apply "commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations." DOT, Appendix 3, *available at* http://www.occupationalinfo.org/appendxc_1.html#III (last visited May 2, 2008).

Hickman contends reasoning level two exceeds her limitation to simple, routine, repetitive work. On the contrary, the ability to perform simple, non-complex work tasks is consistent with reasoning level two. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (level two reasoning appears consistent with "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214 (3rd Cir. 2004)(reasoning level two does not contradict limitation to simple, routine, repetitive work); *Harrington v. Astrue*, 2009 WL 102689 *2 (S.D.Cal.2009) (simple, repetitive work is consistent with the definition of GED reasoning level two); *Koch v. Astrue*, 2009 WL 1743680 *17 (D.Or. 2009) (level two reasoning is consistent with simple, routine tasks); *Meissl v. Barnhart*, 403 F.Supp. 981, 984 (C.D.Cal. 2005).(same).

Second, Hickman contends the VE's testimony conflicts with information in the DOT, because the VE said a person limited to simple tasks could work as an office worker. Hickman argues this conflicts with the DOT reasoning level of two. If testimony provided by a VE is inconsistent with DOT work requirement information, the ALJ must resolve the conflict before relying on the testimony to find that a claimant is not disabled. The ALJ must explain how the conflict was resolved. SSR 00-4p. The ALJ was not compelled to resolve any conflict here, however, because reasoning level two is consistent with simple, routine, repetitive work.

Third, Hickman argues the ALJ failed to properly apply the medical-vocational guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2 ("Grids") as a framework for reaching her decision. The ALJ could not rely exclusively on the grids, because she found Hickman had functional impairments not reflected by the four vocational factors used in the grids. *Tackett v. Apfel*, 180 F.3d at 1102. Under such circumstances, an ALJ must demonstrate that suitable jobs exist in the national economy through the testimony of a vocational expert. *Id.*; *Thomas*, 278 F.3d at 960; *Moore v. Apfel*, 216 F.3d 864, 870-71 (9th Cir. 2000). The ALJ properly relied on the testimony of the VE, who indicated that jobs exist in the national economy for a hypothetical individual with Hickman's age, education, work experience, and RFC. Admin. R. 406.

Where an individual has impairments resulting in both strength and nonexertional limitations, the grid rule reflecting the individual's maximum residual strength capabilities, age, education, and work experience provides a framework for consideration of how much the individual's occupational base is further diminished by the additional limitations. SSR 83-14, 1983 WL 31254 *3. Here, the ALJ used Rule 202.18, which reflected Hickman's age, education, and work experience and the capacity to perform work at the light level of exertion. Admin. R. 406. Rule 202.18 directs a finding of "not disabled." This is consistent with the testimony of the VE that jobs exist in the national economy that an individual with Hickman's vocational factors can perform.

Hickman argues the ALJ's step five conclusion is undermined by *Lounsburry v. Barnhart*, 468 F.3d 1111, 1117 (9th Cir. 2006), in which the court held that one occupation did not constitute a "significant range of work" as that phrase is used in Rule 202.00(c) of the grids. The court held Lounsburry was disabled because the ALJ identified only one occupation to which he could adjust. *Lounsburry*, 468 F.3d at 1117-18. Hickman argues *Lounsburry* compels a finding that she is

17 - OPINION AND ORDER

disabled because the VE identified only one occupation not precluded by her RFC assessment. This argument cannot be sustained because *Lounsburry*'s definition of "significant range of work" pertains only to cases analyzed under Rule 202.00(c) of the grids. *Tommasetti v. Astrue,* 533 F.3d 1035, 1043-44 (9th Cir. 2008). Rule 202.00(c) applies in specific circumstances which are not present here.

In the circumstances of this case, "work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements" which the claimant is able to meet given her RFC and vocational factors of age, education and work experience. 20 C.F.R. § 416.966(b). The VE testified that a significant number of jobs in the occupation office helper exist in Oregon and in the national economy. This testimony is consistent with the grid rule the ALJ used as a framework. Accordingly, the ALJ did not err in her use of the grids as a framework for her decision.

Fourth, Hickman contends the ALJ elicited testimony from the VE with assumptions that did not accurately reflect all of her functional limitations. The ALJ considered all the evidence and reached an RFC assessment based on the limitations supported by the record as a whole. Hickman's challenges to the RFC assessment cannot be sustained for reasons discussed previously. The ALJ was not required to incorporate additional limitations she found not supported by the record. *Osenbrock v. Apfel,* 240 F.3d 1157, 1163-65 (9th Cir. 2001); *Magallanes,* 881 F.2d at 756-57. The ALJ elicited testimony from the VE based on the RFC assessment and properly relied on the VE's testimony because it was elicited with a hypothetical question which "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record." *Bayliss v.*

*Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005). Hickman's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## CONCLUSION

For these reasons, the court **AFFIRMS** the Commissioner's decision and **DISMISSES** this matter.

IT IS SO ORDERED.

Dated this 24 day of July, 2009.

GARR M. KING
United States District Judge

19 - OPINION AND ORDER